IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARY ESPINOZA, on behalf of §
M.G., a minor child, §
                                §
          Plaintiff, §
                                §
v. §          CIVIL ACTION NO. H-12-2982
                                §
CAROLYN W. COLVIN, §
ACTING COMMISSIONER OF THE §
SOCIAL SECURITY §
ADMINISTRATION, §
                                §
          Defendant. §

<u>**MEMORANDUM OPINION**</u>

Pending before the court are Plaintiff's Motion for Summary Judgment (Doc. 14) and Defendant's Cross-Motion for Summary Judgment (Doc. 11).[1]  The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion.

**I.  Case Background**

Plaintiff ("Mrs. Espinoza") files this suit pursuant to 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Mrs. Espinoza's claim for supplemental security income under Title XVI

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  <u>See</u> Docs. 8, 9, 10.

of the Social Security Act ("The Act") on behalf of her son, M.G., a minor.

## A.  **Medical History**

M.G. was born on October 10, 1993, and was sixteen years old on the date the application was filed.[2]  He attends high school as a full-time student.[3]

M.G.'s medical records reflect that M.G. was a fourteen-year-old healthy male with no ongoing medical issues when he was first referred by his primary care physician to Texas Children's Hospital ("TCH") for an evaluation for Marfan Syndrome.[4]

William J. Craigen, M.D., ("Dr. Craigen"), a physician at TCH's Cardiovascular Genetics Clinic, conducted the initial evaluation on March 6, 2008, and noted that M.G. had typical Marfan syndrome features, such as long hands, legs, toes and fingers, as well as the presence of stretch marks over the back and shoulders.[5]  Although a significant pectus carinatum (protrusion of the ribs and sternum) was noted, chest x-rays did

---

[2]    See Tr. of the Admin. Proceedings ("Tr.") 40, 65, 101, 134, 172. Mrs. Espinoza claimed that the onset of M.G.'s disability coincided with his birth.  However, supplemental security income is not payable prior to the month following the month in which an application is filed.  See 20 C.F.R. § 416.335.

[3]    See Tr. 40.

[4]    See Tr. 468. Marfan syndrome is "a disorder of connective tissue inherited as a simple dominant and characterized by abnormal elongation of the long bones and often by ocular and circulatory defects." Merriam-Webster's Medical Dictionary 395 (1995).

[5]    Tr. 321.

not detect any abnormalities, and an electrocardiogram ("EKG") was normal.[6]  In addition, a cardiac stress test was performed and found to be normal without evidence of EKG changes.[7]  M.G. reported that his usual physical activities included playing basketball with friends and lifting weights.  After the initial evaluation, Dr. Craigen restricted M.G.'s weightlifting and any other physical activity until the status of M.G.'s aortic root could be determined by an echocardiogram ("Echo").[8]  Dr. Craigen noted that, although M.G. had a number of marfanoid features, M.G. was developing normally, had been healthy, and was quite active.[9]

On March 12, 2008, M.G. underwent an Echo, which revealed a mildly dilated aortic root.[10]  Dr. Craigen referred M.G. to John Lynn Jefferies, M.D., M.P.H., ("Dr. Jefferies") at the TCH Cardiovascular Genetics Clinic for further evaluation.[11]  After Dr. Jefferies' initial evaluation of M.G., he recommended that M.G. take Atenolol, twenty-five milligrams once a day, restrict

---

[6]   See id.

[7]   See id.

[8]   See Tr. 470.

[9]   See Tr. 463.

[10]   See Tr. 473.

[11]   See Tr. 321.

certain physical activities, and follow up in six months' time with a repeat Echo and EKG.[12]

M.G. next returned to TCH on November 5, 2008.[13]  On Dr. Jefferies' orders, M.G. underwent a second Echo, which revealed a mild to moderately dilated aortic root, without evidence of aortic insufficiency.[14]  Dr. Jefferies increased the dose of Atenolol to fifty milligrams once a day, continued certain activity restrictions, and ordered another follow-up visit in approximately six months.[15]  Dr. Jefferies noted during the physical examination that M.G. appeared to be a healthy, fifteen-year-old male with Marfan syndrome.[16]

On March 9, 2009, M.G. presented himself at TCH's emergency room ("ER") complaining of chest pain and difficulty breathing.[17]  The ER physician ordered x-rays of Plaintiff's chest and found M.G.'s lungs to be well expanded without

---

[12]    See Tr. 207.

[13]    See Tr. 315.

[14]    See Tr. 316.

[15]    See id.

[16]    See Tr. 315.

[17]    See Tr. 256, 259.

abnormalities.[18]   M.G. was discharged from the ER and told to follow up with Dr. Jefferies.[19]

M.G.'s next visit with Dr. Jefferies was on May 8, 2009.[20] A third Echo was conducted, which revealed a moderately dilated aortic root without evidence of aortic insufficiency.[21]   Dr. Jefferies recommended that M.G. continue Atenolol at fifty milligrams daily, continue restricting his activities, and return to the clinic in approximately six months.[22]

However, before the next six-month visit with Dr. Jefferies, M.G. was seen at TCH's ER on September 20, 2009.[23] M.G. complained of influenza symptoms (coughing, sore throat, backache, and fever).[24]   A flu test was conducted, and the results were negative for two types of flu.[25]   M.G. was discharged the same day with instructions to follow up with his primary care physician.[26]

---

[18]   See Tr. 476.

[19]   See Tr. 267.

[20]   See Tr. 310.

[21]   See id.

[22]   See id.

[23]   See Tr. 280.

[24]   See id.

[25]   See Tr. 292.

[26]   See Tr. 284, 288.

On November 4, 2009, M.G. returned for his six-month check-up with Dr. Jefferies, who noted that M.G. was a healthy-appearing, fifteen-year-old male with Marfan syndrome.[27]   M.G. underwent an Echo exam that found a mildly dilated aortic root, with normal thickness and systolic function.[28]   Dr. Jefferies recommended that M.G. continue the current dose of Atenolol of fifty milligrams daily, continue activity restrictions, and follow up in six months.[29]   In addition, Dr. Jefferies recommended a cardiac magnetic resonance imaging scan ("MRI") to better assess the aortic dilation.[30]

On May 25, 2010, M.G. underwent a cardiac MRI to evaluate his aortic root and aorta for dilation, aneurysm, and dissection.[31]   The MRI results revealed: (1) a possible history of connective tissue disorder; (2) a moderate pectus carinatum deformity of the anterior chest wall;[32] (3) a mildly dilated

---

[27]   See Tr. 304.

[28]   See id.

[29]   See id.

[30]   See id.

[31]   Tr. 452.

[32]   Tr. 454.

aortic root;[33] (4) a non-dilated left ventricle with normal left ventricular systolic function.[34]

The following week, on June 2, 2010, M.G. returned to Dr. Jefferies for a six-month check-up.[35] M.G. complained that he had been suffering from recurring headaches for the previous five to six months.[36]  After receiving the results of the MRI, Dr. Jefferies increased M.G.'s daily Atenolol to 100 milligrams (fifty milligrams twice daily).[37]  Dr. Jefferies recommended that M.G. continue restricting his activities, obtain an orthopedic evaluation annually, and follow up with Dr. Jefferies' clinic twice annually.[38]  Dr. Jefferies also referred M.G. to a headache clinic.[39]

On June 9, 2010, M.G. underwent a scoliosis evaluation at TCH's Orthopedic Surgery Clinic.[40]  The physical exam results revealed that M.G. did not have scoliosis.[41]  Furthermore, the notes described M.G. as a well-developed, well-nourished, tall

---

[33]   See id.

[34]   Id.

[35]   See Tr. 447.

[36]   Id.

[37]   Tr. 448.

[38]   Id.

[39]   See id.

[40]   See Tr. 329, 445.

[41]   Tr. 445.

young male who had no complaints of back pain, foot pain, or knee pain.[42]   The treating physician reported that no orthopedic intervention was necessary for M.G.[43]

On September 27, 2010, M.G. was admitted to TCH's ER complaining of shortness of breath and chest pain radiating to his left shoulder.[44]   The ER conducted a computed tomography angiography ("CT") scan of the chest.[45]   The CT scan results revealed a mildly dilated aortic root with no significant abnormality identified, specifically, no evidence of aortic dissection.[46]   M.G. was released from the ER after completing the CT scan and reporting no more chest pain.[47]

Dr. Jefferies wrote to the Social Security Administration ("SSA") on July 20, 2010.[48]   In the letter, Dr. Jefferies noted that M.G. had physical findings consistent with Marfan syndrome and a dilated aortic root.[49]   Dr. Jefferies wrote that M.G.: (1) would need follow-up visits at least twice annually; (2) would be

---

[42]   Id.

[43]   Id.

[44]   See 410, 415.

[45]   See 428.

[46]   See Tr. 429.

[47]   See Tr. 415, 423.

[48]   Tr. 207.

[49]   See id.

limited to light exercise, avoiding activities that would result in sustained elevation of his blood pressure; and (3) would need to avoid any strenuous weight-lifting activities with a weight limit of approximately twenty pounds.[50]   Also, Dr. Jefferies stated that M.G. was unable to stand or sit in a fixed position for an extended period of time.[51]   Finally, Dr. Jefferies stated that M.G. was prescribed Atenolol fifty milligrams once a day, and, although the medication could result in fatigue or drowsiness, M.G. should tolerate the medicine well.[52]   Dr. Jefferies concluded that M.G. was disabled and unable to perform the necessary tasks to maintain gainful employment.

On January 21, 2011, Dr. Dhaval R. Parekh ("Dr. Parekh"), sent a letter to the SSA that was nearly identical to Dr. Jefferies' letter in every respect.[53]   In this letter, Dr. Parekh noted that M.G. had physical findings consistent with Marfan syndrome and dilated aortic root.[54]   Dr. Parekh provided the same diagnostic and prognostic information and offered the same

---

[50]     Id.

[51]     Id.

[52]     See id.

[53]     Compare Tr. 207-08 with Tr. 215-16.

[54]     See id.

opinion as Dr. Jefferies, in the exact words, regarding M.G.'s limitations and disability status.[55]

On May 20, 2011, Dr. Parekh completed a Physical Residual Functional Capacity Questionnaire.[56]   In the questionnaire, Dr. Parekh wrote that M.G. could lift twenty pounds rarely, sit about two hours in an eight-hour workday, stand and walk for less than two hours in an eight-hour workday, and would miss work about two days per month.[57]

## B.   Application to Social Security Administration

Mrs. Espinoza, on behalf of M.G., protectively applied for Supplemental Security Income for the first time on October 13, 2009, claiming that M.G. had scoliosis, Marfan syndrome, and an enlarged valve in the heart.[58]   In the initial Function Report dated October 15, 2009, Mrs. Espinoza denied that M.G.'s daily activities were limited;[59] she also denied that M.G.'s ability to take care of his own personal needs and safety was limited.[60] Mrs. Espinoza answered "not sure" to a question asking if M.G.'s

---

[55]   Compare Tr. 207-08 with Tr. 215-16.

[56]   See Tr. 495.

[57]   See Tr. 495-99.

[58]   See Tr. 9, 128, 149.  According to an undated disability report, it appears M.G. had a previous denial of Social Security benefits from the Appeals Council on September 25, 2009.  See Tr. 143.

[59]   See Tr. 137.

[60]   See Tr. 140.

physical abilities were limited, and ignored the follow-up
portion of the question that asked which particular activities
M.G. was, or was not, capable of completing.[61]   Also, Mrs.
Espinoza answered "not sure" to a question asking if M.G.'s
impairment affected his social activities or his behavior with
other people and failed to give specific examples called for by
the question.[62]   Finally, Mrs. Espinoza denied that M.G. had
limitations in paying attention and completing tasks.[63]

Luci Parmer ("Ms. Parmer"), a ninth grade teacher,
completed a form concerning M.G.'s overall functioning in the
classroom.[64]   In the report, Ms. Parmer listed Atenolol as M.G.'s
prescribed medicine.[65]   Although Ms. Parmer stated that she spent
forty-five minutes a day, Monday through Friday with M.G., she
checked "Don't know" when asked whether M.G. experienced any side
effects from Atenolol.[66]   Additionally, Ms. Parmer reported that
she did not observe that M.G. had any physical or mental
limitations with regard to the six areas of functioning covered

---

[61]   See Tr. 138.

[62]   See Tr. 139.

[63]   See Tr. 141.

[64]   See Tr. 156-63.

[65]   See Tr. 162.

[66]   See id.

11

by the questionnaire.[67]  She checked "No" when asked if M.G. frequently missed school due to illness.[68]

In an undated Disability Report completed by Mrs. Espinoza, M.G. was identified as a ninth-grade, six-foot-eight-inch male, who weighed 150 pounds.[69]  In the report, Mrs. Espinoza denied that M.G.'s illness caused pain or other symptoms.[70]  Mrs. Espinoza listed Atenolol as a heart medication prescribed to M.G. and answered "none" for side effects caused by Atenolol.[71]

In connection with Mrs. Espinoza's appeal of the initial disability determination, she completed another Disability Report.[72]  In this second report, Mrs. Espinoza claimed that M.G. experienced physical pain, was "unable to do normal things", and was physically incapable of doing many normal daily activities, but failed to mention any specifics with regard to changes in

---

[67]     See Tr. 156-63.  The areas listed on the report are the six domains the ALJ uses to the determine disability status of minor children according to SSA regulations.

[68]     See Tr. 162.

[69]     Tr. 148.  Although the disability report is undated, the report is located in the administrative record behind a form called an Authorization for Source to Release Information to SSA, dated October 21, 2009.  Tr. 147.

[70]     Tr. 149.

[71]     Tr. 151.

[72]     Tr. 164.

12

M.G.'s condition.[73]   Mrs. Espinoza also documented that M.G. was taking Atenolol without experiencing any side effects.[74]

A Function Report dated August 6, 2010, was completed by Mrs. Espinoza.[75]   In the report, Mrs. Espinzoa said that M.G.'s daily activities were limited, but that he attended school full-time.[76]   Mrs. Espinoza also documented that M.G.'s ability to communicate was limited, explaining that M.G. occasionally spoke with his family but did not have friends.[77]   She noted that M.G. was depressed, and that he only came out of his room to bathe, eat, or go to school.[78]   The Function Report listed that M.G.'s physical limitations included not walking or running too far, and not dancing, swimming, or bicycling.[79]   Mrs. Espinoza explained in the report that M.G. could walk but that he became winded very quickly.[80]

Mrs. Espinoza also stated that M.G. was limited in his ability to make new friends or to maintain friends his own age

---

[73]   See Tr. 164, 168.

[74]   See Tr. 167.

[75]   See Tr. 174-82.

[76]   See Tr. 177.

[77]   See Tr. 178.

[78]   Id.

[79]   See id.

[80]   See id.

and that she attributed these limitations to his Marfan syndrome.[81]  Mrs. Espinoza documented that M.G. preferred to be by himself and to play computer/video games.[82]  She also wrote that M.G. had enjoyed playing basketball but was no longer able to play due to doctor-imposed limitations.[83]

In the report, Mrs. Espinoza also stated that M.G.'s abilities to take care of his personal needs and his safety were limited because of back and knee pain due to Marfan syndrome.[84] Mrs. Espinoza wrote that M.G.'s abilities to keep busy on his own and to complete his homework on time were limited, explaining that she had to help him complete those tasks.[85]  She reported no limitation in M.G.'s ability to work on craft projects, to finish things he had started or to complete chores most of the time.[86]

In an undated Disability Report - Appeal, Mrs. Espinoza claimed that M.G.'s condition was getting worse, that he experienced constant migraines, had problems with dizziness, was depressed and had new issues with his vision.[87]  The report

---

[81]    See Tr. 179.

[82]    See id.

[83]    See id.

[84]    See Tr. 180.

[85]    See 181.

[86]    Id.

[87]    See Tr. 193.

stated that M.G. took Atenolol but did not experience any side effects.[88]

Defendant denied M.G.'s application at the initial and reconsideration levels.[89]   Plaintiff requested a hearing before an administrative law judge ("ALJ") of the SSA.[90]   The ALJ granted the request and conducted a hearing on May 27, 2011.[91]

### C.   **Hearing**

Mrs. Espinoza and M.G. testified at the hearing.[92]   M.G. testified that he had trouble concentrating in math and other subjects, explaining, "[L]ike my head starts to hurt and my eyes do too and I tend to doze off and I just put my head down because I just don't want to do it no more and I just get tired of the teachers just talking."[93]   Although M.G. stated that he experienced headaches at school twice a week, he had never gone to the nurse's office because of them.[94]   He also related that the headaches could last a day unless he took over-the-counter

---

[88]   See Tr. 196.

[89]   See Tr. 1-4, 6-8.

[90]   See Tr. 80-91, 93-97, 101.

[91]   Tr. 80.

[92]   See Tr. 40, 51.

[93]   See Tr. 41.

[94]   See Tr. 42.

15

medication, such as benadryl.[95]   M.G. stated that he did not
participate in gym class because of doctor's orders.[96]   Although
M.G. told the ALJ that he had refrained from playing basketball
with the school team after the doctor told him that over-exertion
could stop his heart, M.G. acknowledged that the doctor did allow
him to play half-court basketball.[97]

M.G. recounted that in March 2009 he went to the ER after
he awoke from sleep unable to breathe.[98]   M.G. testified that the
doctors at the ER drew blood, took his temperature, and
administered oxygen before releasing him from the hospital.[99]
When M.G.'s attorney asked him about the two other ER visits,
M.G. said that he could not recall those visits.[100]

M.G. also testified that the distance between classes
caused him to become fatigued.[101]   M.G. said that he had received
several tardy notices, which he blamed on the distance between
classes.[102]   M.G. testified that while he was able to do chores

---

[95]     See Tr. 42.

[96]     See Tr. 43.

[97]     See id.

[98]     See Tr. 44.

[99]     See id.

[100]     See Tr. 45.   Although M.G.'s attorney specifically questioned M.G.
about the reasons for ER visits in 2010 and 2011, there is no documentation of
a 2011 ER visit in the administrative record.

[101]     See id.

[102]     See Tr. 45-46.

around his house, such as mowing the yard and washing the car, his mother did not allow him to do these chores because they made him tired.[103]   M.G. testified that he experienced chest pains randomly while eating or playing video games.[104]   In addition to chest pains, M.G. testified he experienced headaches that were triggered by light, which was another reason he preferred to be in his dark bedroom playing video games.[105]

Mrs. Espinoza testified that she initially took her son to TCH because his chest was protruding and he complained of having pain in his arms, knees and back.[106]   Mrs. Espinoza told the ALJ that M.G. could run, but not as far as other children and on occasion had trouble breathing.[107]   She also testified that M.G. had problems walking because he tired easily and experienced difficulty with his legs.[108]

Mrs. Espinoza stated that M.G. missed approximately three days of school a month, mostly due to headaches and medical appointments, and that she was called to the school once a month because M.G. was in the nurse's office complaining of

---

[103]   See Tr. 46.

[104]   See Tr. 49.

[105]   See id.

[106]   See Tr. 53.

[107]   See Tr. 54.

[108]   See id.

headaches.[109]   Mrs. Espinoza said she provided documentation from TCH after the attendance clerk at M.G.'s high school questioned his absences.[110]

Mrs. Espinoza testified that her son helped around the house by cleaning his room and cleaning around the house.[111] She said other activities her son performed included mowing half of the yard and learning to drive a car.[112] Mrs. Espinoza testified that M.G.'s friends came to the house and played video games in his room, but they did not go outside and play or go places together. However, she told the ALJ that M.G. became depressed and stopped playing basketball after the doctor warned him of the risk of death from overexertion.[113]

Mrs. Espinoza testified that M.G. experienced other problems due to Marfan syndrome including problems with his teeth and eyesight.[114] Mrs. Espinoza reported that M.G. complained of

---

[109]    See id.

[110]    See Tr. 55.

[111]    See id.

[112]    See 55-56.

[113]    See Tr. 59, 60.

[114]    See Tr. 57-58. Mrs. Espinoza said that M.G. visited the dentist four times a month because his teeth were crooked and because he had required several root canals.  She also testified that the lenses in M.G.'s eyes separated from the pupils, which could pose a problem later in life.  In fact, Dr. Lewis found that M.G. had a mild ectopia lentis, no phakodonesis or iridodonesis, a normal dilated fundus examination and no peripheral retinal pathology.  Dr. Lewis considered M.G. to be "doing quite well."  See Tr. 488.

18

chest pains at various times.[115]   She also stated that M.G. had become more tired as he grew older, and the doctors told her fatigue was a common symptom for people with Marfan syndrome.[116] She testified that M.G.'s medical treatment only required a doctor's appointment once every six months for x-rays and an EKG.[117]

## D.   **Commissioner's Decision**

On June 17, 2011, the ALJ issued an unfavorable decision.[118]   The ALJ found that M.G. had not engaged in substantial gainful activity during the relevant period and that he had multiple severe impairments (dilated aortic root, pectus excavatum, mild ectopia, and high myopia/astigmatism secondary to Marfan syndrome).[119]   According to the ALJ, M.G.'s severe impairments, individually or collectively, did not meet or medically equal the applicable regulations ("the Listings").[120] In particular, the ALJ considered Listing 102.02 (loss of visual acuity), Listing 102.10 (loss of visual efficiency), and Listing

---

[115]   See Tr. 61.

[116]   See Tr. 60.

[117]   See Tr. 62.

[118]   See Tr. 9-20.

[119]   See Tr. 12.

[120]   Tr. 12.  The regulations are found at 20 C.F.R. Pt. 404, Subpt. P, App.1.

4.10 (aneurysm of aorta).[121]  The ALJ stated that Listings 102.02
and 102.10 were not met or medically equaled because M.G. had
20/20+ vision in each eye after correction.[122]

Although there was no specific Listing for Marfan
syndrome, the ALJ relied on the notes accompanying Listing 4.10
to evaluate M.G.'s aortic dilation.[123]  The ALJ found that the
criteria of Listing 4.10 was not met because there was no
evidence of an aneurysm of the aorta or its major branches.[124]

The ALJ found that M.G.'s aortic root was mildly dilated
as documented in a cardiac MRI from May 2010 and there was no
indication of any significant aortic insufficiency.[125]  The ALJ
noted that a CT scan of M.G.'s chest taken in September 2010
showed no indication of a dissection or leak.[126]  Specifically,
the ALJ mentioned that M.G. had normal left and right ventricular
function and that radiographic evidence was negative for an
aortic dissection.[127]  Furthermore, although M.G. complained of

---

[121]   Tr. 12.

[122]   Id.

[123]   See id.  The ALJ cited § 104.00F10 of 20 C.F.R. Part 404, Subpart P,
Appendix 1 in his report.  See id.

[124]   Id.

[125]   Tr. 14.

[126]   Tr. 12.

[127]   Tr. 14.

headaches, they were relieved by over-the-counter medications and, thus, not disabling.[128]

Although the ALJ found that M.G.'s medically determinable impairments could cause the alleged symptoms, he also found statements made by M.G., as well as those of his mother, concerning the intensity, persistence and limiting effects of those symptoms not to be fully credible to the extent they were inconsistent with his finding that M.G. did not have an impairment or combination of impairments that functionally equaled any Listing.[129]   Although the ALJ acknowledged the severity of M.G.'s symptoms, including chest pain and shortness of breath, he did not find that they led to marked restrictions in any of the six domains evaluated to determine functional equivalence of the Listings when the claimant is a minor child.[130]

The ALJ found that M.G. was able to: (1) keep busy on his own; (2) complete his homework; (3) clean his room; (4) care for his personal hygiene; (5) walk; and (6) run on occasion despite

---

[128]   See id.

[129]   See Tr. 14.

[130]   See id.  An ALJ uses a three-step process to determine if a child is disabled.  At the third step of the analysis, the ALJ evaluates the child's ability to function in six domains (acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for oneself, and health and physical well-being).

experiencing fatigue.[131]   The ALJ pointed out that although M.G. and his mother alleged numerous absences from school, the record did not support the claimed frequency of M.G.'s absences due to illness or doctor's appointments.[132]

The ALJ gave little weight to Dr. Parekh's assessment that M.G. could lift twenty pounds rarely, sit about two hours in an eight-hour day, stand and walk for less than two hours in an eight-hour day, and would be absent about two days per month because the ALJ found these statements not supported by the record.[133]   The ALJ found that M.G.'s attendance at school on a full-time basis, along with evidence of M.G.'s activities of daily living, was inconsistent with Dr. Parekh's assessment that M.G. was unable to sit for more than two hours in an eight-hour day or stand and walk less than two hours in an eight-hour day.[134]

The ALJ gave some weight to the statements of Dr. Jefferies restricting M.G. to light exercise, no more than twenty pounds of lifting, and activities that would not elevate blood pressure, because the ALJ found them to be consistent with the

---

[131]   Tr. 14.

[132]   See id.  The ALJ reviewed doctors' notes and hospital records from 2009 to 2011 and found no evidence that medical appointments occurred on a consistent monthly basis.  See id.

[133]   See id.

[134]   See id.

record as a whole.[135]   However, the ALJ gave little weight to Dr. Jefferies' statement that M.G. was unable to sit or stand in a fixed position for extended periods of time in light of the ALJ's opinion that M.G. could engage in light exercise and M.G.'s full-time school attendance.[136]

Relying also on assessments made by medical consultants[137] and M.G.'s ninth grade teacher, the ALJ found M.G. not to be disabled.[138]   Mrs. Espinoza appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[139]   Mrs. Espinoza then timely sought judicial review of the ALJ's decision.

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating the record; and (2) substantial evidence in the record supports

---

[135]   See Tr. 15.

[136]   See id.

[137]   Those medical consultants were Robin Rosenstock, M.D., who completed a Childhood Disability Evaluation Form dated September 20, 2010 (Tr. 350-55), and Yvonne Post, D.O., who completed a Childhood Disability Evaluation Form dated December 31, 2009 (Tr. 376-81).

[138]   See id.

[139]   See Tr. 1-5.

the decision.   Waters v. Barhart, 276 F.3d 716, 718 (5th Cir. 2002).

**A.   Legal Standard**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.   Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).

The regulations provide that a child's disability claim should be evaluated according to the following sequential three-step process: (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has a medical impairment or combination of impairments that is severe; and (3) if so, the child's impairment or combination of impairments meet, medically equal, or functionally equal the severity of a Listing. See 20 C.F.R. § 416.924(b)-(d).

At the third step of the analysis, the Commissioner evaluates the child's ability to function in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. See 20 C.F.R. § 416.926a(b)(1).   If a child's impairment results in "marked" limitations in two domains or an "extreme" limitation in one

24

domain, that impairment is deemed functionally equal to a Listing. <u>See</u> 20 C.F.R. § 416.926a(a).

A "marked" limitation is one that seriously interferes with the child's ability "to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It is "more than moderate" but "less than extreme". <u>Id.</u> A child is said to have an "extreme" limitation if his impairment "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). In determining whether a child claimant has a "marked" or an "extreme" limitation, the Commissioner must review all of the evidence of record and "compare the child's functioning to the typical functioning of same-aged children who do not have impairments." 20 C.F.R. § 416.926a(f)(1); <u>see also</u> 20 C.F.R. § 416.926a(b).

In evaluating a child's claim for disability, the Listings are considered. <u>See</u> 20 C.F.R 416.924(d). If a child cannot qualify under these listings, he is denied benefits. <u>Id.</u>

## B.   <u>Substantial Evidence</u>

"Substantial evidence" is largely recognized as "that quantum of relevant evidence that a reasonable mind might accept

as adequate to support a conclusion." <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." <u>Id.</u> The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u> If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990); <u>see also</u> 42 U.S.C. § 405(g).

A finding of no substantial evidence is thus appropriate only if no credible evidentiary choices or medical findings support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court must review the entire record and may not re-weigh the evidence, decide the issues de novo, or substitute the court's judgment for that of the Commissioner. <u>See</u> <u>Brown</u>, 192 F.3d at 496. In short, the court is to defer to the decision of the Commissioner to the extent possible without making its review meaningless. <u>Id.</u> (citing <u>Taylor v. Bowen</u>, 782 F.2d 1294, 1298 (5th Cir. 1986).

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's

decision contains the following errors: (1) the ALJ erroneously denied giving certain opinions of M.G.'s treating physicians "controlling" weight; (2) the ALJ erroneously found M.G.'s aortic root to be "mildly dilated" rather than "moderately dilated;" and (3) the ALJ failed to discuss and evaluate the side effects of Atenolol, despite evidence in the record of a history of chronic fatigue.  Defendant argues that the decision is legally sound and is supported by substantial evidence.   The court considers the merits of the arguments in turn.

A.      **Treating Physicians' Opinions**

M.G. argues that the ALJ should have given controlling weight to the opinions of Dr. Parekh and Dr. Jefferies' concerning his physical limitations.  Defendant responds that the ALJ considered both opinions, appropriately rejecting Dr. Parekh's opinion as inconsistent with record evidence concerning M.G.'s activities and properly crediting only those portions of Dr. Jefferies' opinion that were supported by the record.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. § 416.927(c). Generally, the ALJ will give more weight to medical sources who treated the claimant.  See 20 C.F.R. § 416.927(c); Greenspan, 38 F.3d at 237.  However, the treating physician's medical opinion

27

is "far from conclusive" and will be given less weight when it is "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." <u>Greenspan</u>, 38 F.3d at 237; <u>see also</u> 20 C.F.R. § 416.927(c)(2); <u>Newton</u>, 209 F.3d at 456; Soc. Sec. Ruling 96-6p, 1996 WL 347180, at *3.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the factors outlined in the regulations to determine the weight to give the opinion. 20 C.F.R. § 416.927(c)(2). Among the factors are whether there are medical signs and laboratory findings presented in support of the opinion and the opinion's consistency with the record as a whole. <u>See</u> 20 C.F.R. § 416.927(c)(2). Engaging in a discussion of these factors is not required unless the ALJ "summarily reject[s] the opinions of [a] treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." <u>Newton</u>, 209 F.3d at 458.

Here, Dr. Parekh wrote a letter in January 2011 in support of M.G.'s claim for disability in which he stated that M.G. was restricted to light exercise, could lift no more than twenty pounds and was unable to stand or sit in a fixed position for an

extended period of time.[140]  In May 2011, in a form completed in support of M.G.'s claim for disability, Dr. Parekh opined that M.G. could stand or walk less than two hours in an eight-hour day and sit about two hours during the same time period.[141]  He limited M.G. to lifting twenty pounds rarely and ten pounds or less occasionally.[142]  Dr. Parekh also found that M.G.'s headaches would frequently interfere with his ability to pay attention and concentrate on simple work tasks.[143]  Dr. Parekh concluded that, in his opinion, M.G. was disabled.[144]

In July 2010, in a letter written in support of M.G.'s claim for disability, Dr. Jefferies opined that M.G. was limited to light exercise that would not result in the sustained elevation of his blood pressure, was not to lift more than twenty pounds and was unable to stand or sit in a fixed position for extended periods of time.[145]  Dr. Jefferies concluded that, in his opinion, M.G. was disabled.[146]

---

[140]     Tr. 215.
[141]     Tr. 497.
[142]     Id.
[143]     Tr. 496.
[144]     Tr. 215.
[145]     Tr. 207.
[146]     Id.

The ALJ found both Dr. Parekh and Dr. Jefferies' opinions inconsistent with the evidence supporting a conclusion that M.G. did not have an impairment or combination of impairments that functionally equaled any Listing.[147]   In so finding, the ALJ stated that M.G. attended school on a full-time basis, a fact that supported the ALJ's conclusion that M.G. was able to sit longer than Dr. Parekh believed.[148]   Both M.G. and Mrs. Espinoza's statements established that not only was M.G. able to attend regular school on a full-time basis, but he was also able to play half-court basketball and help with household chores.[149]

Furthermore, M.G.'s school record shows M.G. earned a an "A" in physical education, while earning good grades in his other subjects.[150]   The ALJ also considered the teacher questionnaire, which disclosed that M.G. had no problems in the first five domains.[151]   In regard to the sixth domain, the teacher merely specified that M.G. wore glasses, noted that he took Atenolol regularly (without any known side effects), and denied that M.G. frequently missed school due to illness.[152]

---

[147]   See Tr. 14.

[148]   See id.

[149]   See Tr. 14, 43-46, 55-56.

[150]   See Tr. 201-03.

[151]   See Tr. 157-62.

[152]   See Tr. 162.

Moreover, the ALJ relied on medical consultants who found M.G.'s impairment or combination of impairments to be severe, but not medically equal to, or functionally equal to any Listing.[153] The medical consultants found that M.G. had a less-than-marked limitation in the domain "moving about and manipulating objects" and gave credence to the M.G.'s treating doctors' opinions that M.G. should not pursue any activities that would result in the sustained elevation of his blood pressure and that M.G. should not lift over twenty pounds.[154]   The medical consultants also found that M.G. had a less-than-marked limitation in the domain of "health and physical well-being".[155]   The medical consultants found no limitations in the other four domains.[156]

The ALJ provided reasons for the weight he accorded to each treating physician, properly giving the opinions weight where they were supported by objective medical testing and other evidence of M.G.'s daily activities and properly assigning little weight to those opinions when not supported by other credible evidence.   See Newton, 209 F.3d at 455-56.   As the determination whether M.G. was disabled is reserved to the Commissioner, the

---

[153]   See Tr. 15, 350.

[154]   See Tr. 353, 379.

[155]   Id.

[156]   See Tr. 352-53, 378-79.

physicians' conclusory opinions that M.G. was disabled was not entitled to controlling weight. <u>Giles v. Astrue</u>, 433 F. App'x 241, 247 (5th Cir. 2011)(unpublished).

Based on substantial evidence in the administrative record, the ALJ's decision to give the treating physicians less than controlling weight was proper.

**B.    Aortic Root Determination**

M.G. hypothesizes that had the ALJ properly recognized M.G.'s aortic root dilation as "moderate," rather than "mild," the ALJ would have likely given controlling weight to the opinions of his treating physicians concerning his physical limitations.[157]

M.G.'s medical records show that a November 2008 Echo revealed a mild to moderately dilated aortic root and a May 2009 Echo showed a moderately dilated aortic root.[158]   In his determination, the ALJ attributed more weight to the results from a more recent May 2010 MRI, which showed M.G.'s aortic root to be mildly dilated.   The ALJ cited that MRI in support of his conclusion that there was no significant aortic insufficiency, normal left and right ventricular function, and no aortic

---

[157]    <u>See</u> Tr. 9-10.

[158]    <u>See</u> Tr. 310, 316.

dissection.   Several months later, on September 27, 2010, M.G. underwent a CT scan which revealed an improved and stable mildly dilated aortic root with no evidence of dissection or leak, and no evidence of pulmonary embolism identified.[159]

Based on all relevant evidence in the record, the evidence clearly supports the ALJ's determination that M.G. had a mildly dilated aortic root and no dissection.

## C.   <u>Medication Side Effects</u>

The regulations state that any side effects of medication must be considered when reaching a decision on a claimant's ability to work.  <u>See</u> 20 C.F.R. § 416.929.

The ALJ noted in his decision that M.G. experienced fatigue.  However, M.G. argues that the ALJ did not properly consider the side effects of M.G.'s medication in the relevant domains.[160]  Although evidence in the record noted that M.G. complained of  fatigue,[161] there is no evidence that the fatigue was due to Atenolol, rather than Marfan syndrome itself.[162]  Of particular note, Mrs. Espinoza repeatedly reported no side effects from medication in the disability and function reports.

---

[159]   <u>See</u> Tr. 429.

[160]   <u>See</u> Doc. 14, Pl's Mot. For Summ. J. pp. 9-10.

[161]   <u>See</u> Tr. 39, 54, 181.

[162]   <u>See</u> Tr. 151, 162, 167, 207, 216.

Regardless of the source of his fatigue, M.G. still attended school every day and helped with chores around the house. His daily activities amount to substantial evidence that M.G. was not disabled.

## IV. Conclusion

Finding no legal error in the ALJ's decision and finding that substantial record evidence supports his conclusion that Plaintiff is not disabled, the court cannot overturn the decision. The court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 9th day of September, 2013.

Nancy K. Johnson
United States Magistrate Judge

34